# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

ILLINOIS TOOL WORKS INC.,
*Plaintiff*,

v.                                                    No. 3:19-cv-01434 (JAM)

J-B WELD COMPANY, LLC,
*Defendant*.

## ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

This case arises at an uncommon intersection between the repair of car mufflers and

principles of intellectual property law. For several decades now, plaintiff Illinois Tool Works

Inc. (ITW) has trademarked the term "MUFFLER WELD" for a product it sells to seal cracks on

car mufflers. But last year J-B Weld Company, LLC (J-B Weld) began to sell its own

formulation of a muffler sealant using the mark "MufflerWeld." In light of the similarity of these

terms, ITW has now moved for a preliminary injunction to bar J-B Weld from continuing to

market its product under the "MufflerWeld" name during the pendency of this litigation.

ITW argues that it is likely to succeed on its trademark infringement claim and that it is

being irreparably harmed. In response, J-B Weld argues that the difference in trade dress

(packaging) between its product and ITW's product defeats any claim of trademark

infringement, and that ITW has not shown irreparable injury in any event. For the reasons

described below, I will grant ITW's motion for a preliminary injunction.

### BACKGROUND

The facts relevant to this motion for a preliminary injunction are largely uncontested.

ITW has, since 1976, sold a sealant for automotive exhaust systems under the name "MUFFLER

WELD." Doc. #4-2 at 1 (¶ 3) ("Agrafojo Decl."). In 1977, the United States Patent and

Trademark Office entered a trademark for MUFFLER WELD on the Principal Register, "for paste sealer for repairing muffler holes," noting that the application disclaimed the word "muffler" aside from the mark as shown. MUFFLER WELD, U.S. Trademark Registration No. 1,064,459 (Apr. 26, 1977), *reproduced in* Agrafojo Decl. at 4. ITW owns this trademark. *Ibid.* An ITW marketing executive, Frank Agrafojo, declares in an affidavit that "MUFFLER WELD sealants are strong sellers for ITW, with annual gross sales in the hundreds of thousands of dollars." Agrafojo Decl. at 2 (¶ 6). For ease of reference, I will call ITW's product, separate and apart from its branding, the "ITW muffler sealant."

J-B Weld sells high-strength adhesives, most notably the product that gave the company its name, "J-B Weld," a "two-part, epoxy, 'cold weld' bonding adhesive," Doc. #14-1 at 2 (¶ 4) ("Hanson Decl."), essentially a very strong glue with many different applications in industry, in the garage, or at home. *Ibid.* According to the affidavit of Carlton Hanson, the Chairman and CEO of J-B Weld Co. LLC, the original epoxy was a success after it debuted in the late 1960s, and the company it launched sought to diversify its product range in the decades thereafter. *Id.* at 3 (¶¶ 7-9). Many, but not all, of these successor products were branded with a modifier suggesting the product's usage concatenated with the word "Weld." *Id.* at 3 (¶ 8). For example, J-B Weld has sold products named RadiatorWeld, TankWeld, MarineWeld, and AutoWeld. *Id.* at 4 (illustrated examples).[1]

Trouble began in April 2018, when J-B Weld started selling a new form of sealant for mufflers, pipe joints, and exhaust systems called "MufflerWeld." For ease of reference, I will

---

[1] J-B Weld asserts that it has owned "Weld" as a standalone common-law trademark for more than 50 years. *See* Hanson Decl. at 6 (¶ 15); Doc. #14 at 4 (Def. Opp. Br.). Plaintiff asserts that J-B Weld owns no such mark, including at common law. Doc. #22 at 10 (Pl. Reply Br.). The parties have provided little by way of specific evidence to support either of these claims, but, as discussed further below, it is not necessary for me to determine the nature and extent of J-B Weld's claims in this preliminary injunction action. This question remains open.

call this product the "J-B Weld muffler sealant." Inspection of the product—submitted with the consent of both parties to the Court to aid in deciding this motion—reveals that J-B Weld has asserted a common-law trademark over the term "MufflerWeld" by placing the ™ symbol next to that term (distinguished from the ® denoting that "J-B Weld" is a registered mark).[2] Neither party has directed the Court to any attempt by anyone to register "MufflerWeld," as opposed to "MUFFLER WELD," with the Patent and Trademark Office.

In August 2019, ITW learned that J-B Weld had started selling the J-B Weld muffler sealant using the mark MufflerWeld and that the J-B Weld muffler sealant had been stocked at AutoZone, a national automotive supply store. Agrafojo Decl. at 2 (¶¶ 9-10). Early in 2019, AutoZone stopped selling ITW's competing muffler sealant; some months later, it began to stock J-B Weld muffler sealant. *Ibid*. This lawsuit and motion for preliminary injunction followed in September 2019. Doc. #1.[3]

The parties have made no submissions about the similarity of the J-B Weld muffler sealant and the ITW muffler sealant at a chemical level, although the safety information contained on the packaging suggests there are some chemical differences between the products. More importantly, for present purposes, the parties do not dispute that both products do essentially the same thing (patch mufflers and other cracked but patchable car parts) by

---

[2] *See* 3 McCarthy on Trademarks and Unfair Competition §§ 19:144-48 (5th ed.) (discussing functions of ® and ™ symbols).

[3] The complaint in the lawsuit has 23 counts, and alleges not only a variety of statutory and common-law violations connected to the sales and marketing of J-B Weld's muffler sealant, but also (1) infringement of ITW's "Ultra Black, Ultra Grey, and Ultra Copper" trademarks by J-B Weld's "Ultimate Black, Ultimate Grey, and Ultimate Copper" products, (2) infringement of ITW's "Permatex" trademark by J-B Weld's "Perma-Lock" products, and (3) false and deceptive advertising of certain of J-B Weld's products as "Made in USA." *See generally* Doc. #1 (Complaint). ITW's motion for a preliminary injunction solely addresses the marketing of the J-B Weld muffler sealant as "MufflerWeld," and nothing in this ruling should be understood as commenting on the remainder of ITW's complaint.

essentially the same method (creating chemical bonds that patch said cracks) at essentially the

same price (around $5-$10) marketed to essentially the same people (so-called "DIYers"

alongside some auto repair professionals and car manufacturers). *Compare* Agrafojo Decl. at 2

(¶¶ 7-13) *with* Hanson Decl. at 3,5 (¶¶ 7, 12).

   The principal difference between the products is their packaging and the means by which

they are dispensed. *See* Hanson Decl. at 6 (¶ 14) (reproduced below).



   ITW's muffler sealant is dispensed from a small black tub (from which the product is

designed to be scooped) and appears in the center of a flame motif with "MUFFLER WELD" in

capital white letters at the top of the package, with "Exhaust System Repair" immediately below

it, and "MUFFLER-CAST" in smaller black letters immediately above and to the right;

VersaChem, the house brand under which ITW sells MUFFLER WELD, appears on the face of the tub itself and in a small logo on the top left. *Ibid*.

J-B Weld's muffler sealant is dispensed directly from a tube that one squeezes; the packaging's colors are alternating bands of red and white except at the top of the tube, which has a black band on which the J-B Weld logo is superimposed. Immediately beneath the J-B Weld logo is the mark "MufflerWeld;" immediately beneath "MufflerWeld" is the legend "Muffler Cement." *Ibid*.

At a teleconference held on November 1, 2019, the parties agreed that I would determine ITW's motion for a preliminary injunction based on the record presently before the Court, *i.e.*, on the basis of the parties' submissions to date. Doc. #40. *See generally* 11A Wright & Miller, Fed. Prac. & Proc. § 2949 (3d. ed.) (evidentiary standards for preliminary injunction hearings).

## DISCUSSION

A district court has the power to "grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office." 15 U.S.C. § 1116(a).

To receive a preliminary injunction, ITW must satisfy a four-part test. First, it must show "either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the [plaintiff]'s favor." *Salinger v. Colting*, 607 F.3d 68, 79 (2d Cir. 2010) (cleaned up). Second, it must show that it is "likely to suffer irreparable injury in the absence of an injunction." *Id*. at 80. Third, "a court must consider the balance of hardships between the plaintiff and defendant and issue the injunction only if the balance of hardships tips in the plaintiff's favor." *Ibid*. "Finally, the court must ensure that the 'public interest would not be disserved' by the issuance of a preliminary injunction." *Ibid*. All in all, because a preliminary injunction "is an

extraordinary and drastic remedy, [it is] one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (cleaned up). *Accord Moore v. Consol. Edison Co. of New York*, 409 F.3d 506, 510-11 (2d Cir. 2005).

Further, when a movant seeks, as ITW does here, a "mandatory preliminary injunction that alters the status quo by commanding some positive act," rather than a "prohibitory injunction seeking only to maintain the status quo," then the burden of proof on the movant is "even higher." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011) (cleaned up). A mandatory injunction "should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Ibid.* A party seeking a mandatory injunction must make "a 'clear' or 'substantial' showing of a likelihood of success" on the merits, in addition to a showing of irreparable harm. *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996).

### I. Likelihood of Success on the Merits

ITW argues that J-B Weld's use of the "MufflerWeld" mark infringes on ITW's MUFFLER WELD mark, in violation of the Lanham Act. 15 U.S.C. § 1114. "A plaintiff's trademark is protected by federal law against infringement by use of colorable imitations of the mark that are 'likely to cause confusion, or to cause mistake, or to deceive.'" *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 502 (2d Cir. 1996) (quoting 15 U.S.C. § 1114(1)). "To prevail on a claim of certification mark infringement, 'a plaintiff must show, first, that its mark merits protection, and, second, that the defendant's use of a similar mark is likely to cause consumer confusion.'" *Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*, 823

F.3d 153, 160 (2d Cir. 2016) (quoting *Brennan's, Inc. v. Brennan's Restaurant, L.L.C.*, 360 F.3d 125, 129 (2d Cir. 2004)).

ITW's MUFFLER WELD mark is a registered and incontestable mark. As J-B Weld's counsel conceded at oral argument, ITW's mark merits protection. *See Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 196 (1985) (describing limitations on challenges to an incontestable mark). The question, then, is whether consumers are likely to confuse J-B Weld's junior "MufflerWeld" mark with ITW's senior MUFFLER WELD mark.

To determine the likelihood of consumer confusion requires me to consider the eight-factor balancing test set forth in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir. 1961) (Friendly, J.). Those factors are:

> (1) strength of the trademark;
>
> (2) similarity of the marks;
>
> (3) proximity of the products and their competitiveness with one another;
>
> (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product;
>
> (5) evidence of actual consumer confusion;
>
> (6) evidence that the imitative mark was adopted in bad faith;
>
> (7) respective quality of the products; and
>
> (8) sophistication of consumers in the relevant market.

*See Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009). "Although the *Polaroid* test originally was applied to non-competing products . . . it has been expanded to apply where, as here, competing goods are involved." *Physicians Formula Cosmetics, Inc. v. W. Cabot Cosmetics, Inc.*, 857 F.2d 80, 83 (2d Cir. 1988).

"The application of the *Polaroid* test is not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused." *Kelly-Brown v. Winfrey*, 717 F.3d 295, 307 (2d Cir. 2013) (cleaned up). "No single factor is dispositive, and cases may certainly arise where a factor is irrelevant to the facts at hand. . . . But it is incumbent upon the district judge to engage in a deliberate review of each factor, and, if a factor is inapplicable to a case, to explain why." *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 400 (2d Cir. 1995).

### 1. Strength of the Muffler Weld Mark

"The strength of a mark is determined by its tendency to uniquely identify the source of the product." *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 384 (2d Cir. 2005). "To gauge a mark's strength, we consider two factors: its inherent distinctiveness, and its distinctiveness in the marketplace." *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998).

As for inherent distinctiveness, the MUFFLER WELD mark is "inherently strong because the USPTO registered it without proof of secondary meaning, so [the Second Circuit] presume[s] 'that the mark is more than merely descriptive' and 'is inherently distinctive.'" *Joules Ltd. v. Macy's Merch. Grp., Inc.*, 695 F. App'x 633, 638 (2d Cir. 2017) (quoting *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 345 (2d Cir. 1999)). "A trier of fact could reasonably conclude that [plaintiff's] word mark, having been incontestable for five years, is strong for the purposes of the *Polaroid* test." *The Sports Authority, Inc. v. Prime Hospitality Corp*, 89 F.3d 955, 961 (2d Cir. 1996).

In measuring a mark's distinctiveness in the marketplace, the Second Circuit has looked to (1) the use of the mark by third parties, *see, e.g.*, *Streetwise Maps, Inc.*, 159 F.3d at 744; (2) the length of time the mark has been used in the relevant marketplace, *see, e.g.*, *Cadbury*

*Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 479 (2d Cir. 1996); (3) volume of sales of the products branded by the mark, *see W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 573 (2d Cir. 1993); (4) expenditures on advertisements containing the mark, *see Lang v. Ret. Living Pub. Co.*, 949 F.2d 576, 581 (2d Cir. 1991); and (5) unsolicited media coverage discussing the mark, *see Scarves by Vera, Inc. v. Todo Imports Ltd. (Inc.)*, 544 F.2d 1167, 1173 (2d Cir. 1976).

Perhaps the most important factor in this analysis is the use of the mark by third parties. *See The Sports Authority*, 89 F.3d at 961; *Streetwise Maps*, 159 F.3d at 744. Other than the alleged use of the mark by J-B Weld—the subject of this lawsuit—there is no evidence that anyone has used MUFFLER WELD or anything even close to MUFFLER WELD to brand muffler sealant (or anything else for that matter) in the last four decades. The absence of any evidence that ITW ever licensed the mark itself to third parties, forfeiting "exclusivity" of sales, distinguishes this case from *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 123 (2d Cir. 2001), the case on which J-B Weld principally relies in its discussion of mark strength.

On the remaining factors, ITW has presented evidence in the form of an affidavit from an ITW marketing executive declaring that the company has sold MUFFLER WELD for the last 43 years and has made hundreds of thousands of dollars from sales of the MUFFLER WELD product annually, from which it is possible to infer that ITW sold tens of thousands of units of MUFFLER WELD each year. Agofojo Decl. at 2 (¶ 6). J-B Weld argues that ITW's statements are "generic[]" and "conclusive[]," Doc. #14 at 20, but it is hard to understand how a sworn statement from a company employee with reason to know these figures that a company has sold tens of thousands of units of its MUFFLER WELD-branded product annually over the past four decades is anything other than probative evidence of the mark's strength in the marketplace.

ITW's evidence of marketplace strength, along with the incontestable nature of the mark, is sufficient to find that the first factor favors ITW.

### 2. Similarity of the Mark

J-B Weld argues that "MufflerWeld" and "MUFFLER WELD" are dissimilar by reason of the insertion of an additional space in ITW's mark, as well as the difference in capitalization. But, perhaps recognizing that this is a slim basis for distinguishing the two marks, J-B Weld concentrates most of its attention on the different trade dress, dispensing receptacles, and house marks of the ITW and J-B Weld products, arguing that a combination of the different trade dress and use of the J-B Weld house mark mean no reasonable consumer would be confused between the two products if viewed side by side.[4]

To support its argument, J-B Weld relies heavily on *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43 (2d Cir. 2000), where the Second Circuit held that "DENTYNE ICE," a chewing gum, did not infringe a plaintiff's "ICE BREAKERS" mark as a matter of law because the trade dresses in which the marks were presented were dissimilar. In reaching this conclusion, the Second Circuit drew attention to the defendant's "prominent use of its well-known house

---

[4] At oral argument, counsel for J-B Weld argued that ITW's failure to conduct a consumer survey on likelihood of confusion, which counsel referred to as "the gold standard" for trademark litigation, merited an adverse inference against it. *See, e.g.*, *Eagle Snacks, Inc. v. Nabisco Brands, Inc.*, 625 F. Supp. 571, 583 (D.N.J. 1985) (drawing adverse inference from absence of a consumer survey). In the Second Circuit, however, survey evidence appears to be particularly probative only in the analysis of actual confusion (factor 5). *See Merriam-Webster, Inc. v. Random House. Inc*., 35 F.3d 65, 72 (2d Cir. 1994) ("The lack of survey evidence counts against finding actual confusion."); *Flushing Bank v. Green Dot Corp*., 138 F. Supp. 3d 561, 590 (S.D.N.Y. 2015) (same). A survey is not required even for a showing of actual confusion, *see The Sports Auth.*, 89 F.3d at 964, and is certainly not decisive in the remainder of the analysis. *See Tools USA & Equip. Co. v. Champ Frame Straightening Equip. Inc.*, 87 F.3d 654, 661 (4th Cir. 1996) ("surveys are not required to prove likelihood of confusion"); *Woodsmith Pub. Co. v. Meredith Corp*., 904 F.2d 1244, 1249 (8th Cir. 1990) (same); *Bos. Athletic Ass'n v. Sullivan*, 867 F.2d 22, 31 n.9 (1st Cir. 1989) (same); *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1086 (7th Cir. 1988) (same). ITW's case may have been stronger with a survey, but it is not seriously weakened without one. *See generally* Robert C. Bird & Joel H. Steckel, *The Role of Consumer Surveys in Trademark Infringement*, 14 U. PA. J. BUS. L. 1013 (2012) (reviewing more than five hundred court opinions over seven years to show that survey evidence is in fact rare in trademark cases, including those cases where plaintiffs prevail).

brand [which] significantly reduces, if not altogether eliminates, the likelihood that consumers will be confused as to the source of the parties' products." *Id.* at 46. *See also Playtex Prod., Inc. v. Georgia-Pac. Corp.*, 390 F.3d 158, 164 (2d Cir. 2004) ("We have repeatedly found that the presence of a distinct brand name may weigh against a finding of confusing similarity"); *W.W.W. Pharm.*, 984 F.2d at 573 ("when a similar mark is used in conjunction with a company name, the likelihood of confusion may be lessened"); *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1045-46 (2d Cir. 1992) ("the prominence of the trade names on the two packages weighs heavily against a finding of consumer confusion"); *Timex Corp. v. AAI.FosterGrant, Inc.*, 2000 WL 1576396, at *10 (D. Conn. 2000) (collecting cases).

*Nabisco* and the cases it cites are in some tension with another line of cases, beginning far back with *Menendez v. Holt*, 128 U.S. 514 (1888), finding that use of a house brand weighed *in favor* of a finding of consumer confusion. In *Holt*, the U.S. Supreme Court held that when the house mark of the alleged infringer "accompanied the brand upon flour sold by appellants, instead of the name of Holt & Co.[, the name of the senior mark holder, t]hat is an aggravation, and not a justification, for it is openly trading in the name of another upon the reputation acquired by the device of the true proprietor." *Id.* at 521. *See also Jacobs v. Beecham*, 221 U.S. 263, 272 (1911) (Holmes, J.) ("The statement [on the packaging] that the defendant makes [the product with the infringing mark] does not save the fraud. That is not what the public would notice or is intended to notice, and, if it did, its natural interpretation would be that the defendant had bought the original business out and was carrying it on. It would be unfair, even if we could assume, as we cannot, that the defendant uses the plaintiff's formula for his [product]").

Judge Friendly, writing in *A. T. Cross Co. v. Jonathan Bradley Pens, Inc.*, 470 F.2d 689 (2d Cir. 1972), likewise concluded that adding the house mark to the infringing mark "does not

save the day; a purchaser could well think plaintiff had licensed defendant as a second user." *Id.* at 692. *See also Arrow Fastener Co.*, 59 F.3d at 395; *In re Bay State Brewing Co., Inc.*, 2016 WL 1045677 (T.T.A.B. 2016) ("In general, use of a house mark does not obviate confusion"); *Sterling House, Inc. v. Dell Publishing Co.*, 1972 WL 17658 at *3 (S.D.N.Y. 1972) (use of house mark with simulation of plaintiff's magazine cover format apparently done "deliberately to take the curse off its imitation of plaintiff's cover" but does not avoid confusion); *see generally* 4 McCarthy on Trademarks and Unfair Competition § 23:43 (5th ed.) (collecting cases).

The Second Circuit has reconciled these two lines of cases by noting the presence of the house mark tends to militate against a finding of confusion "where the junior and senior marks are *not identical*." *Playtex Prod., Inc. v. Georgia-Pac. Corp.*, 390 F.3d 158, 165 (2d Cir. 2004) (emphasis added). "Identical" here does not mean identical down to the last pica: the senior mark in *A. T. Cross*, where the addition of the house mark was "aggravation," was "CROSS," while the junior mark was "La Crosse," 470 F.2d at 690-91. But many of the cases in which the use of a house mark *did* "save the day" for the junior mark were ones where the junior mark overlapped only partially if at all with the senior mark. *See, e.g.*, *Nabisco*, 220 F.3d at 44 ("DENTYNE ICE" and "ICE BREAKERS"); *Playtex*, 390 F.3d at 164 ("Moist Ones" and "Wet Ones"); *Bristol-Myers Squibb*, 973 F.2d at 1046 (in trade dress infringement action, "Tylenol PM" and "Excedrin PM"); *Verilux, Inc. v. Hahn*, 2007 WL 2318819, at *5-6 (D. Conn. 2007) ("INDOOR SUNSHINE" and "SUNSHINE IN A BOX").

This case features senior and junior marks that *are* identical; they are the same words pronounced the same way and differ on the packaging only by the removal of a space between the two (nonetheless obviously distinct) words and a trivial alteration in capitalization. *See LaTouraine Coffee Co. v. Lorraine Coffee Co.*, 157 F.2d 115, 117 (2d Cir. 1946) (finding

infringement of "LaTouraine" by junior mark "Lorraine" because, in part, "the similarity [between the marks] is . . . most striking in oral speech; a call for one in a store is likely to produce the other"). The conclusion that the two marks here are identical is buttressed by J-B Weld's failure to use its house mark to transform the "MufflerWeld" word mark into a larger, integrated mark that might be more readily distinguishable from MUFFLER WELD.

In *Nabisco* itself, what the Second Circuit found significant about the trade dress and house brands were not that it distinguished the *products* but that they distinguished the *word marks themselves*. A hypothetical customer visiting a gas station at which gum was sold would not ask for "Ice" if they wanted gum; they would ask for "Dentyne Ice" or "Ice Breakers." The trade dress of junior user Dentyne Ice places the words "Dentyne" and "Ice" together so they form a single mark in the eye of the consumer: thanks to this blend of trade dress and house marks, the consumer would ask for a "Dentyne Ice" rather than, as it were, "Dentyne's Ice," something quite different from "Ice Breakers." (This can be seen in a comparison of the products reproduced below from the opinion in *Nabisco*, below.)



220 F.3d at 45.

Similar facts were at work in *W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567 (2d Cir. 1993), where the plaintiff's lip balm bore the registered mark "Sportstick" and defendant's deodorant used the mark "Sport Stick." Although the Second Circuit noted the absence of the space as a distinguishing factor between the word marks, it laid much greater stress on the junior user (Gillette's) use of its "Right Guard" brand on the packaging to render the junior mark, in effect "Right Guard Sport Stick"—the presence of the additional words, along with the trade dress, caused the junior word mark to become dissimilar from the senior mark. *Id.* at 573.[5]

J-B Weld's brand does not do what "Right Guard" or "Dentyne" did to transform their otherwise similar word mark into a dissimilar word mark, for two reasons. First, "J-B Weld MufflerWeld" is an awkward phrase to pronounce owing to the coincidence of the two "welds"; the average customer is unlikely to ask for "J-B Weld MufflerWeld" and think of it as a wholly separate product from "VersaChem Muffler Weld" in the same way a consumer would distinguish "Dentyne Ice" and "Ice Breakers."[6] Second, the visual distinction in the trade dress between the J-B Weld logo and the MufflerWeld word mark strongly implies that J-B Weld and MufflerWeld are distinct word marks, albeit each owned by the same company, an impression reinforced by the separate use of the ® symbol and the ™ symbol between "J-B Weld" and "MufflerWeld," implying that these are separate marks.

---

[5] *Gillette* may also be distinguishable for a simpler reason: "the products themselves [were] used for different purposes," 984 F.2d at 573, unlike the functionally identical products at issue here.

[6] This impression is reinforced by the packaging of J-B Weld's "original" twin tube epoxy, supplied at Hanson Decl. at 3 (¶ 6), which like the J-B Weld muffler sealant has the J-B Weld logo prominently in a black band at the top of the product, beneath which, in the same position as "MufflerWeld" on the J-B Weld muffler sealant, is the word mark "J-B Weld." The packaging template applied to both the J-B Weld "original" epoxy and the J-B Weld muffler sealant, in other words, presumes that a customer will not connect the house brand logo on the black band with the name of the specific product on the red band; no-one asks for a "J-B Weld J-B Weld."

In other words, rather than creating a new word mark incorporating the house brand ("J-B Weld MufflerWeld"), the house brand simply denotes J-B Weld's use of a mark identical to the senior mark save a change in capitalization and a space ("MufflerWeld").

Combined with the relative lack of prominence of the VersaChem brand on the Muffler Weld trade dress, purchasers familiar with ITW's product are likely to assume that the J-B Weld house mark simply identifies what had previously been an anonymous source, or that MUFFLER WELD was a descriptive term for muffler sealant, or, most damagingly, that J-B Weld was the original producer of MUFFLER WELD and that it is ITW's product that is the infringing copy. *See In re Fiesta Palms, LLC*, 2007 WL 950952, at *4 (T.T.A.B. 2007).

To be sure, the employment of the J-B Weld house mark in conjunction with the J-B Weld house trade dress, along with the different containers for the products, distinguishes J-B Weld's muffler sealant *product* at least somewhat from the ITW muffler sealant, especially when viewed side by side. But ITW is not suing for trade dress infringement; it is suing for infringement of its MUFFLER WELD word mark. *Contrast Nora Beverages*, 269 F.3d at 122 (similarity analysis confined to discussion of trade dress infringement); *Bristol-Myers Squibb*, 973 F.2d at 1042 (same). J-B Weld's appropriation of that word mark is not saved by the house mark or trade dress when these simply denote J-B Weld's theft of ITW's mark rather than transforming the word mark itself into something new. *See In re Mighty Leaf Tea*, 601 F.3d 1347-48 (Fed. Cir. 2010) ("the presence of an additional term in the mark does not necessarily eliminate the likelihood of confusion if some terms are identical"). Applying the Second Circuit's analysis in *Playtex* leads to the conclusion that the use of the house mark in conjunction with the junior mark in the circumstances presented by this case is "an aggravation, not a justification." *Menendez*, 128 U.S. at 521.

Indeed, the Second Circuit has already held that differences in trade dress or product placement cannot stave off a finding of similarity under factor two when a word mark has been appropriated wholesale. In *Virgin Enterprises Ltd. v. Nawab*, 335 F.3d 141 (2d Cir. 2003), the Second Circuit held that the defendants' use of the name "Virgin" to re-sell wireless telephone services at a kiosk in a Long Island Mall infringed the "Virgin" mark registered by Virgin Enterprises for its telephony services. The Second Circuit explained that "[p]laintiff's and defendants' marks were not merely similar; they were identical to the extent that both consisted of the same word, 'virgin.'" *Id*. at 149. Although "[d]efendants' logo used a different typeface and different colors from plaintiff's [and] those are indeed differences, they are quite minor in relation to the fact that the name being used as a trademark was the same in each case." *Ibid*. The court went on:

> Advertisement and consumer experience of a mark do not necessarily transmit all of the mark's features. Plaintiff, for example, advertised its Virgin Megastores on the radio. A consumer who heard those advertisements and then saw the defendants' installation using the name VIRGIN would have no way of knowing that the two trademarks looked different. *See The Sports Auth.*[89 F.3d at 962]. A consumer who had visited one of plaintiff's Virgin Megastores and remembered the name would not necessarily remember the typeface and color of plaintiff's mark. The reputation of a mark also spreads by word of mouth among consumers. One consumer who hears from others about their experience with Virgin stores and then encounters defendants' Virgin store will have no way knowing of the differences in typeface. *See Hills Bros. Coffee, Inc. v. Hills Supermarkets, Inc*., 428 F.2d 379, 381 (2d Cir. 1970) (*per curiam*).
>
> In view of the fact that defendants used the same name as plaintiff, we conclude the defendants' mark was sufficiently similar to plaintiff's to increase the likelihood of confusion. This factor favored the plaintiff as a matter of law.

*Id.* at 149.

As above, so below. Both parties use the same name to market the same product to the same people. The differences in trade dress do not render the word marks dissimilar, when the word mark is simply MUFFLER WELD without specification of font or color. *Cf. Winfrey*, 717 F.3d at 314 (no counterfeit even when marks were textually identical because "stylized, powder-blue letters" were part of the registration of the senior mark); *Gruner + Jahr Printing & Pub. Co. v. Meredith Corp*., 991 F.2d 1072, 1078 (2d Cir. 1993) (finding dissimilarity when registered mark included specific typeface and other elements).

As the Second Circuit explained in *Virgin*, consumers do not rely on trade dress alone to work out which product is which. Indeed, they may rely on it even less today, 16 years on from *Virgin*, where more than a few consumer purchases begin by inputting the *words* identifying the product into an internet search engine, rather than attempting to feed that search engine a photograph of the product's trade dress. In the specific context of this case, a consumer entering AutoZone and asking for "Muffler Weld" would doubtless be directed to the J-B Weld muffler sealant (the only MufflerWeld or MUFFLER WELD on the scene), without contrasting ITW trade dress to remedy the confusion thus created.

Word marks would lose much of their meaning if a competitor could market an identical product using the senior product's registered mark and escape all liability for infringement simply by slapping the competitor's logo on the product, changing the trade dress, or making a minor punctuation change. To argue otherwise would be to argue that ITW could put out a new line of epoxies branded as "VersaChem JB WELD," with a different trade dress and prominent VersaChem logo, and not infringe J-B Weld's word mark because it did not include a hyphen. *See* J-B Weld, U.S. Trademark Registration No. 1,008,265 (Dec. 10, 1973).

For all of the foregoing reasons, I find that the similarity of mark factor favors ITW.

### 3. *Competitive Proximity*

"This factor focuses on whether the two products compete with each other. To the extent goods (or trade names) serve the same purpose, fall within the same general class, or are used together, the use of similar designations is more likely to cause confusion." *Lang*, 949 F.2d at 582. In determining competitive proximity, "[t]he question is whether the parties offer their products to the same market audience." *O'Keefe v. Ogilvy & Mather Worldwide, Inc.*, 590 F. Supp. 2d 500, 522 (S.D.N.Y. 2008) (quoting *Mejia & Assocs., Inc. v. Int'l Bus. Machines Corp.*, 920 F. Supp. 540, 548 (S.D.N.Y. 1996)).

J-B Weld does not argue that its muffler sealant and ITW's muffler sealant are anything other than direct competitors. Nor could it; they are. This factor favors ITW.

### 4. *"Bridging the Gap" Between the Products*

Because ITW and J-B Weld are selling functionally the same product in direct competition with each other, "the 'bridging the gap' factor is irrelevant." *Starbucks Corp.*, 588 F.3d at 115 (cleaned up); *see also Star Indus.*, 412 F.3d at 387 (when the subject "products are already in competitive proximity, there is really no gap to bridge, and this factor is irrelevant to the *Polaroid* analysis"). This is particularly true in this case, where the gap is only one space long.

### 5. *Evidence of Actual Consumer Confusion*

Neither party offers evidence of actual confusion, or lack of actual confusion. ITW excuses its failure to provide such evidence by pointing, first, to the relatively short time both products were on the market (about one year), and, second, to the much shorter time between ITW's "discovery" of J-B Weld's product and the initiation of this lawsuit (about one month). The question is whether this absence of evidence is probative, as J-B Weld argues, or simply neutral, as ITW claims.

To begin with, I do not agree with ITW's argument that its burden to produce actual consumer confusion is lessened because ITW only discovered the existence of the J-B Weld muffler sealant a few months ago. The "actual confusion" factor looks to the time the product was on the market, not when the mark holder discovered the existence of a competitor. *See New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 342 (S.D.N.Y. 2010).

On the other hand, the J-B Weld muffler sealant was on the market for a little less than a year before this suit was filed, *see* Hanson Decl. at 5 (¶ 12) (J-B Weld's muffler sealant launched "in April 2018"). An approximate one-year market exposure sits squarely in between the time periods in which the Second Circuit has held lack of evidence of actual confusion irrelevant and time periods it has held the absence of evidence of actual confusion probative. *Compare Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 830 F.2d 1217, 1227 (2d Cir. 1987) ("The absence of such proof [of actual confusion] is not especially significant in the present case, particularly given the short time before trial—four months—in which the marks were 'competing.'") *with Plus Prod. v. Plus Disc. Foods, Inc.*, 722 F.2d 999, 1006 (2d Cir. 1983) ("no evidence of confusion for over a three-year period, during which substantial sales occurred, is a strong indicator that the likelihood of confusion is minimal").

Faced with this liminal period of competition, I conclude that this factor tips towards J-B Weld, but only slightly. In making this finding, I am mindful that "[e]vidence of actual confusion is not required to prove the likelihood of confusion between the two marks," *Centaur*, 830 F.2d at 1227, and that "[e]vidence of actual confusion in the post-sale context is particularly difficult to come by," *Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 240 (S.D.N.Y. 2012).

### 6. *Evidence that the Imitative Mark was Adopted in Bad Faith*

This factor "looks to whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Lang*, 949 F.2d at 583. "Bad faith may be inferred from the junior user's actual or constructive knowledge of the senior user's mark." *Star Indus.*, 412 F.3d at 389.

J-B Weld had constructive notice of the senior mark. *See Chandon Champagne Corp. v. San Marino Wine Corp.*, 335 F.2d 531, 535 (2d Cir. 1964) (Friendly, J.) (discussing constructive notice). Indeed, on the very packaging of J-B Weld's MufflerWeld, J-B Weld's registered marks are carefully denoted by ® and every use of MufflerWeld is followed by ™, indicating that J-B Weld was far from an ingenue in the world of trademark protection. "Where such prior knowledge is accompanied by similarities so strong that it seems plain that deliberate copying has occurred, we have upheld findings of bad faith." *Paddington Corp. v. Attiki Importers & Distributors, Inc.*, 996 F.2d 577, 587 (2d Cir. 1993). Here, of course, MufflerWeld differs from MUFFLER WELD only by capitalization and spacing. "Intentional copying, of course, does not require identical copying." *Ibid.*

Even more probative of J-B Weld's bad faith is the employment of the phrase "Muffler *Cement*" (emphasis in original) underneath the use of the MufflerWeld mark on its muffler sealant product's trade dress. This case presents the inverse of *Lang v. Ret. Living Pub. Co.*, 949 F.2d 576 (2d Cir. 1991), which held that "selection of a mark that reflects the product's characteristics . . . support[s] a finding of good faith." *Id.* at 583. Here, J-B Weld selected a mark that reflected the product's characteristics—MufflerCement (which would also have been less bothersome to say out loud than "J-B *Weld* Muffler*Weld*")—and then elected to employ a mark almost identical to the registered mark instead on the very same package. "It should be known by

this time that this court does not look with much favor on the businessman who, out of the wealth of words available, chooses as a trademark one which comes as close as he dares to a well-known mark on the identical product." *A. T. Cross*, 470 F.2d at 692.

J-B Weld's claim that its employment of a near-identical mark to ITW's to brand a near-identical product was an innocent coincidence arising from its custom to brand all of its products with its alleged common-law mark "Weld" "seems exceedingly lame, as often is the case." *Ibid*. This is particularly so given defense counsel's tacit concession at oral argument that J-B Weld had many products it did *not* brand with "Weld," including "SteelStik," "PlasticBonder," "KwikWood," and "ExtremeHeat."[7] J-B Weld's brand history certainly shows that the company is allergic to spaces between words, but exactly why SteelStik passes muster and MufflerCement does not is a mystery. All of this evidence provides sufficient support, at this preliminary injunction stage, to conclude that J-B Weld sought to trade on the reputation and goodwill of the long-established "MUFFLER WELD" product and employed the "MufflerWeld" mark in bad faith. *See Lang*, 949 F.2d at 583.

### 7. *Respective Quality of the Products*

The only evidence ITW submits as to the respective quality of the products is ITW's uncontested statement that the products sold well. ITW's evidence is not strongly probative of quality, as ITW recognizes: it argues in its briefing that the quality factor is neutral.

The only pieces of evidence J-B Weld introduces relevant to the respective quality of the products are eight negative internet reviews of ITW's MUFFLER WELD from Amazon.com and

---

[7] Indeed, the complaint includes photographs of still other J-B Weld products that are otherwise weld-less, including J-B Weld's ULTIMATE BLACK, ULTIMATE GREY, and ULTIMATE COPPER gasket makers. Doc. #1 at 12-14 (¶¶ 41-48). *See also J-B Weld Products*, J-B WELD https://www.jbweld.com/products (accessed Dec. 10, 2019) [https://perma.cc/U6H8-Y3KF].

(continued…)

O'Rielly Auto Parts. Hanson Decl. at 6-8 (¶¶ 16-17).[8] The reviews are hearsay, and although I

may consider hearsay in a preliminary injunction determination, *see Mullins v. City of New York*,

626 F.3d 47, 52 (2d Cir. 2010), I do not find the reviews probative, let alone persuasive. To

begin with, there is no evidence to suggest the reviews under consideration were made in good

faith by real people who actually bought the product. This is a serious problem with internet

reviews, even those purported to be from, or by, "Verified Purchasers."[9] Even if these reviews

were "real" reviews, on the modern Internet it is a rare product that does not attract at least a

small handful of negative product reviews. The presence of negative reviews on their own does

little, if anything, to bespeak the quality of the underlying product.

To consider one highly relevant example, J-B Weld's original epoxy, the product that J-B

Weld avers has made the company "*the* market leader in epoxies," Hanson Decl. at 2 (¶ 7)

(emphasis in original), has attracted no fewer than 112 critical reviews on Amazon.com.[10] I

imagine J-B Weld would react indignantly to a claim from ITW or any other competitor that

these negative reviews are probative of the quality or reputation of J-B Weld's product or the J-B

Weld brand. And rightly so; online reviews are "bimodal" and reflect extreme positions rather

than the question at issue in the likelihood of confusion analysis—the view of the average actual

---

[8] J-B Weld primarily uses the internet reviews to buttress its arguments on irreparable harm, Doc. #14 at 12, but
because the reviews are not probative of anything in dispute in this preliminary injunction proceeding, it is
convenient to discuss them in the context of the quality of the products—the prong of the analysis where the
argument of their relevance is strongest.

[9] *See* Sapna Maheshwari, *When Is A Star Not A Star? When It's An Online Review*, N.Y. Times (Nov. 28, 2019),
https://www.nytimes.com/2019/11/28/business/online-reviews-fake.html [https://perma.cc/72PH-EGKY] (collecting
F.T.C. complaints and research indicating that a large number of consumer reviews are faked, including ones from
ostensibly "verified purchasers").

[10] *See* J-B Weld 8265S Original Cold-Weld Steel Reinforced Epoxy - 2 oz, AMAZON.COM (accessed Dec. 10, 2019)
https://www.amazon.com/product-
reviews/B0006O1ICE/ref=cm_cr_arp_d_viewpnt_rgt?ie=UTF8&filterByStar=critical&reviewerType=all_reviews&
pageNumber=1#reviews-filter-bar [https://perma.cc/56JB-LXAB].

(continued…)

consumer.[11] This is perhaps why J-B Weld points to no cases in which a court has accepted negative internet reviews as probative of the lack of quality of the underlying product, or, for that matter, the weakness of a mark, the poor reputation of the mark, or irreparable harm.[12]

I conclude therefore that the product quality factor is neutral. And I note that "[t]he issue of the quality of the secondary user's product goes more to the harm that confusion can cause the plaintiff's mark and reputation than to the likelihood of confusion." *Virgin*, 335 F.3d at 152.

### 8. Sophistication of Consumers in the Relevant Market

"Likelihood of confusion must be assessed by examining the level of sophistication of the relevant purchasers." *W.W.W. Pharm.*, 984 F.2d at 575. In reviewing this factor, I must consider "[t]he general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *Ibid.* (cleaned up). "[T]o the extent that a senior user's potential customers . . . do not have a sophisticated knowledge of the overall market, the likelihood is higher that similarity of trademarks may lead them to believe that a junior user's activities are affiliated with those of the senior user." *Guthrie Healthcare Sys. v. ContextMedia, Inc*., 826 F.3d 27, 43 (2d Cir. 2016).

The parties' proffered evidence of either the target market or the sophistication of the consumers in that market is slim to none, and rests mostly on speculations based on the nature

---

[11] *See generally* Nadav Klein et al., *Online Reviews are Biased. Here's How to Fix Them*, Harv. Bus. Rev. (March 6, 2018), https://hbr.org/2018/03/online-reviews-are-biased-heres-how-to-fix-them [https://perma.cc/36YP-GEYR]; Caroline Beaton, *Why You Can't Really Trust Negative Online Reviews*, N.Y. Times (June 13, 2018), https://www.nytimes.com/2018/06/13/smarter-living/trust-negative-product-reviews.html [https://perma.cc/UK4P-DJUK].

[12] Internet reviews have occasionally featured as evidence of consumer confusion, *see, e.g.*, *Friars Nat. Ass'n v. 9900 Santa Monica, Inc*., 2005 WL 1026553, at *5 (S.D.N.Y. 2005), but are more probative of consumer identification of the product or its source rather than the brand's reputation for quality, where consumer reviews will acquire the bimodal bias described above.

and price of the product and the claims made on the packaging. ITW argues that the target market is DIYers who engage in automotive repair projects, and these purchasers are relatively unsophisticated. J-B Weld does not discuss the relative sophistication of consumers of DIY muffler sealants in its submissions, but its product, at least, avers that it is used by "OEMs," that is, automotive manufacturers, who may be counted on to be quite discerning in their choice of muffler sealants.

"In some cases a court is entitled to reach a conclusion about consumer sophistication based solely on the nature of the product or its price." *Star Indus.*, 412 F.3d at 390. That the product was cheap ($5-$10) weighs in favor of a finding of limited sophistication, *see Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc.*, 281 F.2d 755, 762 n.19 (2d Cir. 1960) (buyer sophistication is usually low "where inexpensive products are involved"). The nature of the product is more equivocal. On the one hand, all muffler sealant does is seal cracks on mufflers. This is not the kind of complex tool or object (such as a muffler itself) that one would need to have high skill to apply: one sees cracks on the muffler, one seals them. The instructions on the products themselves appear to presuppose a limited degree of sophistication. Both ITW and J-B Weld's products claim on their packaging that they can be applied in just three steps.

On the other hand, even setting aside potential professional customers, it is a select audience bold enough to seek to seal cracks in their own car muffler rather than entrusting their unhappy automobile to the tender yet expensive care of the auto repair professional. A degree of intrepidation, of particular passion for the repair of complex machines, and an accompanying obsessive attention to detail might be expected. I conclude that this factor is neutral.

### 9. Balancing the Polaroid Factors

In sum, the first, second, third, and sixth *Polaroid* factors favor ITW; the fourth factor is irrelevant; factor five favors J-B Weld slightly; factors seven and eight are neutral or inconclusive.

Having made findings as to each *Polaroid* factor, I must now determine what weight to give to each. "[N]o single *Polaroid* factor is determinative," *Plus Prods.*, 722 F.2d at 1004, but the first three factors—strength, similarity, proximity—are "perhaps the most significant," *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir. 1987). Indeed, the Second Circuit has observed that "our cases demonstrate . . . that the likelihood of confusion, the 'crucial' issue in a case such as this, often depends on the similarity of the marks and the proximity of the products." *Vitarroz Corp. v. Borden, Inc.*, 644 F.2d 960, 966 (2d Cir. 1981).[13]

Here, I find that the first three "most significant" *Polaroid* factors favor ITW; the third factor (proximity) favors ITW unreservedly. Only one *Polaroid* factor tips in favor of J-B Weld—lack of evidence of actual confusion—and it favors J-B Weld only slightly. And I have concluded that J-B Weld has acted in bad faith, which at most establishes a presumption of confusion, *Paddington Corp.*, 996 F.2d at 586, and at least causes J-B Weld to "lose the benefit of the doubt" if the likelihood of confusion question is "close." *TCPIP Holding Co. v. Haar Commc'ns, Inc.*, 244 F.3d 88, 102 (2d Cir. 2001). It is not. ITW has established a likelihood of consumer confusion.

---

[13] Professor Barton Beebe, conducting an extensive study of federal appellate opinions on trademark infringement, concludes that both in the Second Circuit and nationwide "the similarity of the marks factor is by far the most important factor in the multifactor test" to determine likelihood of confusion, with the intent to infringe, the proximity of the goods, evidence of actual confusion, and the strength of the plaintiff's mark as the remaining "core factors," in descending order of importance. *See* Barton Beebe, *An Empirical Study of the Multifactor Tests for Trademark Infringement*, 94 CAL. L. REV. 1581, 1623 (2006). Every one of these core factors—bar evidence of actual confusion—favors ITW.

After all this long discussion, the question here boils down to whether trademark law permits one company to market a functionally identical product to the same people at the same price using the same name as another company's directly competing product so long as the junior user changes the dispensing mechanism, adds its logo and trade dress, and makes a trivial change to the senior mark's spacing and capitalization. It does not. At this preliminary injunction stage, and without prejudice to any further proceedings in this case, *see A. T. Cross*, 470 F.2d at 691, I conclude that ITW has made a clear showing of a substantial likelihood of success on the merits.[14]

### II. Irreparable Harm

"Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Rodriguez v. DeBuono*, 175 F.3d 227, 233-34 (2d Cir. 1999). Although "the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered," *id.* at 234, it was once the law of the Second Circuit that "proof of a likelihood of confusion establishes both a likelihood of success on the merits and irreparable harm." *Brennan's*, 360 F.3d at 129. Under this line of precedent, my determination that there is a likelihood of confusion would suffice for this prong.

The Supreme Court's decision in *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006), has changed the analysis. In *eBay*, the Supreme Court held that the traditional four-factor test

---

[14] ITW has argued in the alternative that J-B Weld has counterfeited its mark. A counterfeit mark is to be distinguished from an infringing mark; while the latter is merely a mark that is likely to cause confusion with the registered mark, a counterfeit is "substantially indistinguishable" from the registered mark. 15 U.S.C. § 1127. Counterfeiting is "the 'hard core' or 'first degree' of trademark infringement that seeks to trick the consumer into believing he or she is getting the genuine article, rather than a 'colorable imitation.'" *Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 242 (S.D.N.Y. 2012). One who counterfeits *a fortiori* infringes a trademark, but one who merely infringes a trademark may not have counterfeited. *See Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003). Because my conclusion that ITW has succeeded in showing likelihood of confusion satisfies the first prong of the preliminary injunction test, I need not and do not make any determinations as to its counterfeit claim.

applies in the patent context, emphasizing that absent express provision in the statutory text, departure from traditional equity principles "should not be lightly implied." 547 U.S. at 391. Although the Second Circuit has not yet expressly applied *eBay* in the trademark context, "nothing in the text or the logic of *eBay* suggests that its rule is limited to patent cases. On the contrary, *eBay* strongly indicates that the traditional principles of equity it employed are the presumptive standard for injunctions in any context." *Salinger*, 607 F.3d at 77-78. *Accord Herb Reed Enterprises, LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1248-50 (9th Cir. 2013) (applying *eBay* to preliminary injunctions under trademark law).

Therefore, ITW must "demonstrate that irreparable injury is *likely* in the absence of an injunction," *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original), rather than merely "possible," *ibid.*; the injury must be "neither remote nor speculative, but actual and imminent," *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (cleaned up); and "remedies available at law, such as monetary damages [must be] inadequate to compensate for that injury." *Salinger*, 607 F.3d at 80.

At the same time, it is important not to lose sight of the peculiarly qualitative nature of harm in many trademark cases. Unlike patent infringement, where damages incurred by infringing uses are readily susceptible to calculation, *see, e.g.*, *Astrazeneca AB v. Apotex Corp.*, 985 F. Supp. 2d 452, 490 (S.D.N.Y. 2013) (discussing, over the course of sixty pages, various formulae and other considerations in pricing the cost of patent infringement), *aff'd in part, rev'd in part*, 782 F.3d 1324 (Fed. Cir. 2015), the principal loss in the infringement of a trademark is that of brand goodwill, an intangible commodity. The confusion between two competing

products cannot be undone by payment of monetary damages; even if it could, it is hard to know how one would calculate the amount.[15] As Judge Friendly explained:

> Where there is . . . such high probability of confusion, injury irreparable in the sense that it may not be fully compensable in damages almost inevitably follows. While an injured plaintiff would be entitled to recover the profits on the infringing items, this is often difficult to determine; moreover, a defendant may have failed to earn profits because of the poor quality of its product or its own inefficiency. Indeed, confusion may cause purchasers to refrain from buying either product and to turn to those of other competitors. Yet to prove the loss of sales due to infringement is also notoriously difficult. Furthermore, if an infringer's product is of poor quality, or simply not worth the price, a more lasting but not readily measurable injury may be inflicted on the plaintiff's reputation in the market.

*Omega Importing Corp. v. Petri-Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir. 1971).

"Although the presumption of irreparable injury is no longer in effect after *Salinger*, the principles articulated in *Omega Importing* remain no less true." *Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 334 (S.D.N.Y. 2011). *See generally* Mark A. Lemley, *Did Ebay Irreparably Injure Trademark Law?*, 92 NOTRE DAME L. REV. 1795, 1803 (2017).[16]

---

[15] *See also* David H. Bernstein & Andrew Gilden, *No Trolls Barred: Trademark Injunctions After eBay*, 99 TRADEMARK REP. 1037, 1054-55 (2009) ("These harms to producers and consumers stemming from a likelihood of consumer confusion are not merely monetary in nature, but they are more fundamentally reputational and difficult to quantify."); J. Thomas McCarthy, *Are Preliminary Injunctions Against Trademark Infringement Getting Harder to Achieve?*, 14 INTELL. PROP. L. BULL. 1, 4-5 (2009) ("[T]rying to use dollars to 'compensate' after the fact for damage to business goodwill and reputation cannot constitute fair or full compensation. Damage to business reputation and good will is inherently 'irreparable.'").

[16] Indeed, there are more than a few Lanham Act violations where, quite literally, damages are unavailable at law. *See Nora Beverages*, 164 F.3d at 745 ("Although a trade dress plaintiff cannot obtain damages without proof of actual confusion, it can obtain injunctive relief without showing actual confusion."). Under the Lanham Act "proof of actual confusion is ordinarily required for recovery of damages," *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A.*, 80 F.3d 749, 753 (2d Cir. 1996), and willfulness is required for an award of damages in the form of an accounting of profits, *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1540 (2d Cir. 1992). Proof of the mere likelihood of confusion, *sans* willfulness, is sufficient to establish a violation of the Act *per se*, but the only relief available is injunctive in nature. *See generally* Lemley, 92 NOTRE DAME L. REV. at 1808 n.79 (citing a 2016 industry trademark litigation report for *Lex Machina*, which found that less than three percent of cases where the plaintiff won resulted in the award of damages).

Other district courts have found that "irreparable harm exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark . . . because loss of control over one's reputation is neither calculable nor precisely compensable." *U.S. Polo Ass'n, Inc. v. PRL USA Holdings Inc.*, 800 F. Supp. 2d 515, 540 (S.D.N.Y. 2011); *accord Juicy Couture, Inc. v. Bella Int'l Ltd.*, 930 F. Supp. 2d 489, 503 (S.D.N.Y. 2013) (collecting cases).

Indeed, in affirming the district court's grant of an injunction in *U.S. Polo Ass'n*, the Second Circuit explained that the district court's finding that the plaintiff "would be irreparably harmed by ceding to [defendant] control over its reputation and goodwill . . . might be made in many infringement cases." *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 511 F. App'x 81, 85 (2d Cir. 2013). The difference, post-*Ebay*, is that "[d]espite the amorphous nature of good will, courts require some factual predicate to support a finding that, absent an injunction, there is an imminent danger that a party's goodwill will be irreparably harmed." *Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp. 2d 186, 195 (E.D.N.Y. 2013).

ITW has satisfactorily provided that factual predicate, in three ways.

The first and most obvious evidence of irreparable harm is ITW's showing that the ITW and J-B Weld muffler sealants are identical except for trade dress and the means by which the products are dispensed (tub v. tube). Although the difference in trade dress and containers cuts in J-B Weld's favor when considering the likelihood of confusion (albeit not enough), it cuts against it on irreparable injury. If a customer examined the products side by side, she would reasonably conclude that these are two different companies selling the same product, "Muffler Weld," which, the consumer would conclude, was a generic or descriptive term for a kind of muffler sealant. It is hard to see how consumers would not draw that conclusion when several

different companies are selling the same product under the same name with only a brand name and brand-distinctive trade dress differentiating them.

This kind of confusion damages the MUFFLER WELD mark itself. A mark becomes the victim of "genericide" when the public appropriates the trademark term as a name for the product itself, a process "set in motion by two, often concurrent processes, namely, (i) the trademark owner's failure to police the mark, resulting in widespread usage by competitors, and (ii) the public's inability to call the product by any other name than the trademarked term." *Horizon Mills Corp. v. QVC, Inc.*, 161 F. Supp. 2d 208, 214 (S.D.N.Y. 2001) (collecting cases).

Here, each day customers see two products, identical in all but brand, being marketed as "Muffler Weld," they will be more inclined to call *all* muffler sealants "Muffler Weld," weakening and genericizing the MUFFLER WELD mark notwithstanding the use of "Muffler Cement" or the house mark on J-B Weld's packaging, or the different containers for the substances, and rendering the MUFFLER WELD ultimately vulnerable to attack or deregistration as generic in the fullness of time. *See Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 13-14 (2d Cir. 1976) (Friendly, J.); *see also Deere & Co. v. MTD Prod., Inc.*, 41 F.3d 39, 42-43 (2d Cir. 1994) (discussing trademark dilution). This erosion of the mark's value is serious, ongoing, and unquantifiable.

Second, as ITW argues, its factual showing that a direct competitor used a near-identical word mark to market a near-identical product is sufficient to show that ITW has lost at least a degree of control over MUFFLER WELD's reputation in the marketplace. "One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark." *El Greco Leather Prods. Co. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d Cir. 1986). At present, the reputation of "Muffler

Weld" rests with both J-B Weld and ITW, each selling a phonetically and functionally identical product. Indeed, when "*the* market leader in epoxies," Hanson Decl. at 3 (¶ 7), has entered the market of a longstanding product and appropriated its name, it does not require presumptions or speculation to anticipate that ITW will lose a considerable amount of control over Muffler Weld's reputation.

ITW's loss of control over Muffler Weld's reputation is compounded by J-B Weld's apparent effort to usurp the MUFFLER WELD mark itself by appending ™ to its use of the word "MufflerWeld." J-B Weld's only submission to the contrary is its eight internet reviews, which, it argues, show that MUFFLER WELD never had much of a reputation to begin with. As I have discussed, this submission is not probative, and is in any event beside the point. Even if MUFFLER WELD and the product it denoted had a horrendous reputation, that reputation would remain the property of ITW and not J-B Weld. If a car breaks down, a passer-by does not acquire the right to seize the car and take it for itself on the theory that the car is no longer any good to its owner.

Third, ITW has provided evidence of a specific instance in which the appropriation of its trademark has already caused, and will continue to cause, it to lose control of the MUFFLER WELD mark—AutoZone's decision to stop stocking ITW's Muffler Weld and start stocking J-B Weld's MufflerWeld. Agrafojo Decl. at 2 (¶¶ 9-10). Customers seeking ITW's Muffler Weld who ask for "Muffler Weld" upon entering an AutoZone will be directed to J-B Weld's product, and likely purchase that product and leave, forever associating those syllables with J-B Weld's product and not ITW's. It is impossible to calculate how many customers would be so deceived, or whether ITW would be able to re-establish its commercial relationship with these customers.

This is a specific instance of harm not redressable by damages, or, at the very least, harm not reparable except by equitable relief.

Accordingly, I conclude that ITW has demonstrated it will be subject to irreparable harm absent an injunction.

### III. Balance of Hardships and Public Interest

In determining the balance of hardships, the Second Circuit has looked to the bad faith of the defendant, whether (even assuming good faith) the defendant could easily have avoided infringement, the ease by which the defendant could commercially comply with the injunction, the relative harm to the plaintiff, and the length of time the infringing product and senior product have been in the marketplace. *See Guthrie*, 826 F.3d at 50.

Every one of these factors favors ITW. I have set out in detail above the array of harms ITW is likely to suffer in the absence of a preliminary injunction. I have also concluded as a preliminary matter that J-B Weld has acted in bad faith. *See TCPIP*, 244 F.3d at 102–03 (2d Cir. 2001) ("a court may be less concerned about imposing [a preliminary injunction] on a party that has conducted itself in bad faith."). And even if J-B Weld acted in good faith, it "could easily have avoided the problem that arose from its adoption of marks already reserved by another user" by conducting a trademark search and then selecting another, unregistered mark. *Guthrie*, 826 F.3d at 50. "Furthermore, this is not a case in which an injunction would have catastrophic effects on the infringer's business." *Ibid*. The J-B Weld muffler sealant has been on the market for less than a year and is just one of a dizzying array of J-B Weld products averred to in J-B Weld's affidavit. *See* Hanson Decl. at 4 (¶ 9).

"Nor is this a case in which the junior user is compelled to give up the name of its business." *Guthrie*, 826 F.3d at 50. And there appears to be "[n]o reason . . . why Defendant

cannot change its [word mark] to one that is not confusingly similar to Plaintiff's without suffering major harm to its business." *Ibid.* "Plaintiff is the injured party, and so far as we can see was without fault in the matter." *Ibid*.

Finally, the short-term harm to J-B Weld from the issuance of an injunction would be militated, at least in part, by the long-term benefit to J-B Weld of rigorous trademark enforcement, given that J-B Weld is itself a holder and dutiful enforcer of its own trademarks and trade dresses. *See, e.g.*, *J-B Weld Co., LLC v. Gorilla Glue Co.*, 2017 WL 8948592 (N.D. Ga. 2017), *reconsideration denied*, 2018 WL 1989308 (N.D. Ga. 2018) (J-B Weld suit against Gorilla Glue for trade dress enforcement). The balance of harms tips towards ITW.

Likewise, the public interest would be served by an injunction, for two reasons.

First, "[t]he public has a great interest in administration of the trademark law in a manner that protects against confusion," and "[t]he public interest would undoubtedly be better served by the elimination of this confusion." *Guthrie*, 826 F.3d at 50. "[T]he public has an interest in not being deceived—in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality." *New York City Triathlon, LLC*, 704 F. Supp. 2d at 344. And "the public interest is served by an injunction that protects property interests in trademarks and helps enforce federal law." *Tyr Sport, Inc. v. Tyr Nat. Spring Water, Inc.*, 2013 WL 2455925, at *4 (D. Conn. 2013). All these interests would be served by preventing J-B Weld from marketing a product that is functionally identical to ITW's, using ITW's own word mark.

Second, the public interest is particularly served by an injunction in this case because of the acknowledged chemical differences between the products at issue. I have described the products throughout this opinion as "functionally identical" based on the representations of the parties and on their packaging's descriptions of the functions of the products. But they are not

wholly, chemically identical. The packages of the products submitted to the Court indicate, by way of safety warnings, that both products contain sodium silicate, but the ITW muffler sealant warns about the presence of crystalline silica while the J-B Weld product's warning does not discuss crystalline silica but does discuss silicic acid and metal fibers (presumably those fibers are the source of the J-B Weld product's claims to be "iron reinforced"), chemicals not present in the ITW product.

The upshot is that consumers are confronted with a situation where they are being sold two different chemicals under the same name, with packaging claiming that they do the same thing, and with almost no ability to distinguish them except by brand unless they are very keen readers of fine print safety warnings. This situation risks being the automotive equivalent of two painkillers with different active ingredients sold under the same name. Neither package reveals the precise chemical composition of the product, probably because it is a trade secret, making distinct marks all the more essential for consumer protection. It is impossible to know whether the same car pipes that would be patched satisfactorily with ITW's muffler sealant product would also be patched by J-B Weld's product, or vice versa. All consumers can rely on is experience, and experience requires clear branding to function.

Otherwise, DIYers consulting a mechanic on which muffler sealant to use who were told to buy "Muffler Weld" based on that mechanic's decades of experience with ITW's product might then purchase J-B Weld's chemically distinct product with unfortunate results. Since the purpose of sealing car mufflers and other auto exhausts is, among other things, to protect the

occupants of a car from carbon monoxide poisoning, the public is ill-served by even the potential for confusion.[17]

Here, where the likelihood of confusion is not merely potential but very real, the public interest weighs strongly in favor of granting an injunction to ensure that mechanics, customers, and car manufacturers can speak of a particular chemical compound—that manufactured by ITW—by the name it has gone by for forty years without the potential for confusion with another chemical compound that purports to do the same thing under an identical name.

## CONCLUSION

For the forgoing reasons, ITW's motion for a preliminary injunction is GRANTED. It is hereby ORDERED AND ADJUDGED that:

1. J-B Weld, its officers, agents, servants, distributors, and employees, and all persons in active concert and participation with them, including their affiliates, are enjoined immediately from selling, offering to sell, advertising, or marketing products bearing the marks "MUFFLER WELD," "MUFFLERWELD," "MufflerWeld," or "Muffler Weld" (collectively "the marks at issue") during the pendency of this litigation;

2. J-B Weld, its officers, agents, servants, distributors, and employees, and all persons in active concert and participation with them, including their affiliates, are enjoined immediately from using any mark that is confusingly similar to the marks at issue in connection with the manufacture, promotion, sale and/or offering for sale of any products during the pendency of this litigation;

---

[17] *See, e.g.*, Amanda Fisher-Hubbard et al., *Accidental Carbon Monoxide Poisoning While Driving*, 39 AM. J. FORENSIC MED. PATHOLOGY 270 (2018), https://dl.uswr.ac.ir/bitstream/Hannan/36459/1/2018%20AJFMP%20Volume%2039%20Issue%203%20September%20%2817%29.pdf [https://perma.cc/RY6R-TN5R].

3. J-B Weld immediately shall recall all of its MufflerWeld-branded products from the marketplace, including from all AutoZone stores, along with all labels, signs, prints, packaging, and advertisements therefor; and,

4. Within ten days of the date of this Order, J-B Weld shall file with the Court an affidavit indicating its compliance with this Order and setting forth the steps it took to comply with this Order.

It is so ordered.

Dated at New Haven this 12th day of December 2019.

/s/ *Jeffrey Alker Meyer*_____
Jeffrey Alker Meyer
United States District Judge