**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| ILLINOIS TOOL WORKS INC.,<br>    *Plaintiff*, | |
|     v. | No. 3:19-cv-1434 (JAM) |
| J-B WELD COMPANY, LLC,<br>    *Defendant*. | |

**ORDER ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

The parties in this case are competing sellers of chemical bonding products marketed for home and automotive use. In this latest installment of a long-running lawsuit, they take aim with claims and counterclaims at each other's advertising practices.

The plaintiff and counter-defendant is Illinois Tool Works Inc. ("ITW"), while the defendant and counter-plaintiff is J-B Weld Company, LLC ("J-B Weld"). The parties have cross-moved for partial summary judgment on several grounds.

First, the parties cross-move for summary judgment on ITW's claim that J-B Weld's use of "Made in USA" labeling constitutes false advertising in violation of the Lanham Act and Connecticut state law. I conclude that there is no genuine issue of fact to show that J-B Weld's "Made in USA" labeling was material to consumer purchasing decisions or that it has caused injury to ITW. Accordingly, I will deny ITW's motion for summary judgment on the "Made in USA" claim and grant J-B Weld's cross-motion to dismiss ITW's "Made in USA" claim.

Second, ITW moves for summary judgment on two of J-B Weld's counterclaims for false advertising against ITW's use of the term "OEM" (an abbreviation for the term "original equipment manufacturer") and the term "epoxy" on some of its product packaging. As to the OEM counterclaim, I conclude that there is no genuine issue of fact to defeat ITW's laches defense. As to the epoxy counterclaim, I conclude that there is no genuine issue of fact to show

1

that the alleged false advertising is material to affecting consumer purchasing decisions. In addition, for both the OEM and epoxy counterclaims, I conclude that they must be dismissed for failure of J-B Weld to show any injury adequate to allow a claim for actual damages, disgorgement, or nominal damages. Accordingly, I will grant ITW's motion for summary judgment to dismiss J-B Weld's OEM and epoxy counterclaims.

BACKGROUND

ITW and J-B Weld are competing sellers of adhesives and silicone sealants marketed for automotive and household use.[1] Among J-B Weld's goods is a line of automotive silicone products.[2] J-B Weld began selling these products in the United States in 2014.[3] J-B Weld has sold them since 2016 through national retailers and online bearing unqualified "Made in USA" claims.[4] J-B Weld has also stated on its website and social media pages that its products are "Made in USA."[5]

J-B Weld does not make the silicone products itself, but rather buys them pre-made from two suppliers.[6] ITW claims that these products contain certain ingredients that the suppliers source from abroad, which J-B Weld largely denies.[7] The parties vigorously debate how significant any of the disputed ingredients are to J-B Weld's silicone products, and they offer competing evidence on the subject.[8]

---

[1] Doc. #224 at 1 (¶ 2).
[2] Id. at 1-2 (¶ 4).
[3] Doc. #218 at 1-2 (¶ 1).
[4] Doc. #224 at 2 (¶¶ 5-6).
[5] Ibid. (¶ 7).
[6] Ibid. (¶ 8).
[7] See id. at 2-8 (¶¶ 8-31).
[8] See Doc. #252-2 (ITW's expert report explaining why these ingredients are "essential" to the functioning of J-B Weld's product); Doc. #224 at 3-4 (¶ 14), 5-6 (¶¶ 18, 20), 8-9 (¶ 29), 9 (¶ 30) (J-B Weld's contentions that, with respect to several of the disputed ingredients, "not all J-B Weld's [silicone products] contain that component, including that product from an alternative supplier"). J-B Weld also claims that ITW's report is hearsay, noting that it is an out-of-court, unsworn statement and that the expert "was never deposed and never presented a declaration in support of summary judgment." Doc. #221 at 20. ITW correctly responds that such a deficiency can be cured and has resubmitted the expert report with the expert's sworn declaration. See Doc. #252-2; Brenord v. Cath. Med. Ctr.

The parties also dispute the general importance of foreign or domestic origin. ITW claims that "Made in USA" advertising matters to consumers—that consumers prefer products made domestically and make purchasing decisions based on such advertising.[9] J-B Weld contests these claims, arguing that the evidence on which they are based—deposition testimony from ITW officers about their views of consumer preferences—is speculative and unsupported.[10]

The parties also disagree about whether J-B Weld's "Made in USA" advertising has caused harm or injury to ITW. ITW points to the same deposition testimony it invokes on the issue of consumer preferences.[11] ITW additionally cites testimony by J-B Weld's CEO in which he stated that "[a]nytime that somebody mislabels or misadvertises product there's harm to the industry and there's harm to the companies that are abiding by that."[12] J-B Weld rejoins that ITW did not include the portion of the deposition allegedly containing that quotation in their filing to this Court.[13]

A separate set of facts underlies ITW's motion for summary judgment on J-B Weld's counterclaims. I will first discuss the facts relating to the OEM counterclaim before turning to the epoxy counterclaim.

As to the OEM counterclaim, the parties agree that ITW advertises "the interchange between its products and the matching OEM manufacturer products" in its materials, including on "product packaging," and has done so since at least 2001.[14] They also agree that J-B Weld's

---

of Brooklyn and Queens, Inc., 133 F. Supp. 2d 179, 183 n.1 (E.D.N.Y. 2001) (allowing plaintiff to resubmit an expert report as an exhibit to his sworn affidavit, thereby curing the deficiency noted by defendants on summary judgment).

[9] Doc. #218 at 24 (¶¶ 64-65).

[10] Doc. #224 at 9-10 (¶ 32 response).

[11] Doc. #218 at 17 (¶ 44).

[12] Doc. #224 at 19 (¶ 86).

[13] Ibid. at 19 (¶ 86 response); see Doc. #197-2 (Ex. 3).

[14] Doc. #224 at 11 (¶¶ 38-39).

chairman and CEO, Chip Hanson, saw certain ITW products on store shelves as early as 2009.[15] Finally, the parties agree that ITW sometimes includes OEM interchanges for specific automotive brands in its package advertising and sometimes omits them; that ITW has used different OEM statements on the same product; and that the specific phrasing ITW uses has "changed based on who is in charge of marketing."[16]

The epoxy counterclaim stems from J-B Weld's allegation that ITW marketed certain products as epoxies despite their not fitting the chemical definition of an epoxy. The parties agree that "an epoxy is a polymer containing one or more epoxy or epoxide groups."[17] They further agree that adhesives containing epoxides are distinct from adhesives containing methyl methacrylate ("MMAs"), and they have distinct health and safety concerns.[18] ITW admits that its Plastic Weld and Plastic Welder products do not contain chemical epoxide groups, and ITW admits that it "has categorized its Plastic Weld and Plastic Welder products as epoxies on its website in the past."[19]

Yet, according to ITW, "from a marketing perspective, the definition of an epoxy is any two-part adhesive," regardless of its specific chemical composition.[20] But J-B Weld contends that purchasers are aware of the chemical meaning of "epoxy," and it cites a few Amazon reviews in which customers say things like "Is this epoxy or just adhesive?"; "Can anyone tell me if this has methyl methacrylate (mma)? that's what i want but i can't tell for sure"; "What is the base chemical of this glue—epoxy, methacrylate, or polyurethane?"[21]

J-B Weld also notes that ITW's "technical product data sheets, which include directions

---

[15] *Id.* at 14 (¶ 59); *see id.* at 10-11 (¶ 36).
[16] Doc. #252 at 4 (¶¶ 10-13).
[17] *Id.* at 5 (¶ 15 response).
[18] *Id.* at 6 (¶ 19).
[19] *Ibid.* (¶ 21 response).
[20] *Ibid.* (¶ 20 response).
[21] Doc. #224 at 24 (¶ 16); *see* Doc. #225-19.

for product use and are available to and directed [at] consumers on [ITW] webpages, differentiate between the 'chemical type' of an epoxy and a non-epoxy."[22] ITW admits this is true for certain of its product sheets.[23] The sheets themselves further identify differences in odor and flashpoint, among other product characteristics.[24]

### DISCUSSION

The principles governing review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (*per curiam*).[25] In assessing whether there is a genuine issue of material fact for trial, a court must view the evidence in the light most favorable to the opposing party and draw all reasonable evidentiary inferences in that party's favor. *Id.* at 657; *Commerzbank AG v. U.S. Bank, N.A.*, 100 F.4th 362, 374 (2d Cir. 2024).

Both parties' motions arise under the Lanham Act and analogous state law. To prevail on a Lanham Act false advertising claim, "a plaintiff must establish that the message at issue is (1) either literally or impliedly false, (2) material, (3) placed in interstate commerce, and (4) the cause of actual or likely injury to the plaintiff." *Souza v. Exotic Island Enters., Inc.*, 68 F.4th 99, 118 (2d Cir. 2023); *see also* 15 U.S.C. § 1125(a)(1)(B).

As for ITW's state law claims, a Lanham Act violation is a per se violation of the

---

[22] Doc. #224 at 24 (¶ 17); *see* Doc. #225-22 at 9, 18.
[23] Doc. #252 at 5 (¶ 17 response).
[24] *See* Doc. #225-22 at 9, 18.
[25] Unless otherwise noted and for ease of reading, this ruling omits all internal quotations, brackets, and derivative citations for all quotations from cases.

Connecticut Unfair Trade Practices Act, and the test for "unfair competition under Connecticut common law is identical to the test under the Lanham Act." *Lavatec Laundry Tech. GmbH v. Voss Laundry Sols.*, 2018 WL 2426655, at *5 (D. Conn. 2018); *see Indiaweekly.com, LLC v. Nehaflix.com, Inc.*, 596 F. Supp. 2d 497, 506 (D. Conn. 2009). Accordingly, I confine my analysis to the Lanham Act with the understanding that it applies to ITW's state law claims as well.[26]

### *"Made in USA"*

ITW moves for summary judgment on its claim that J-B Weld is liable under the Lanham Act for its use of "Made in USA" advertising. J-B Weld cross-moves for summary judgment on the same claim, arguing that ITW has not established either materiality or injury, and that its claim is barred by the equitable defenses of laches and unclean hands. I agree that J-B Weld that ITW has not established as a matter of law that any misrepresentation was material or that it was injured thereby.

Take materiality first. A defendant's allegedly false statement is material if the representation "'involved an inherent or material quality of the product.' In other words, the allegedly false statement must be 'likely to influence purchasing decisions.'" *Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 63 (2d Cir. 2022) (quoting *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 63 (2d Cir. 2016)). "If consumers, faced with the choice to purchase either the plaintiff's product or the defendant's, are likely to prefer the defendant's product by reason of the defendant's false advertising, the falsity of the defendant's advertising is material to the plaintiff's Lanham Act claim." *Church & Dwight Co., Inc. v. SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48, 71 (2d Cir. 2016).

---

[26] J-B Weld states it intends to dismiss its state law counterclaims and is proceeding only under the Lanham Act. *See* Doc. #221 at 33 n.13.

ITW insists that J-B Weld's "Made in USA" claim is material because consumers make purchasing decision based on such claims. But its only evidence in support are two deposition excerpts in which ITW employees offer their opinions and vague impressions on the issue.[27] The former director of marketing, Daniel Clarke, testified that consumers "definitely" purchase products "based on Made in the USA advertising."[28] When asked to explain his reason for this view, he replied: "Because of the type of consumer that shops for our products in general, the profile are people that highly value Made in the USA."[29] He added that "[t]here's certainly potential for [consumers] to prioritize that . . . for instance, I was shopping for boots the other day . . . I looked for made in America boots . . . because I didn't care about the brand as much as I cared about that."[30]

Similarly, the VP/GM of ITW's Permatex division, David Barnette, testified that his company wanted to ensure that J-B Weld followed the "same standard" with respect to "Made in USA" advertising because "there may be value in a 'Made in the USA' claim that could influence a customer [retailer] to make a placement decision on a product or a consumer to purchase a product based on that claim."[31]

Courts that have deemed "Made in USA" claims material have been offered much richer evidentiary records. This is so even in the cases that ITW cites in support of its cause. In one such case, the defendant's own expert "acknowledged the importance of the 'Made in USA'

---

[27] ITW explicitly states that its survey expert offers no opinion on materiality. Doc. #218 at 19 (¶ 47 response).

[28] Doc. #218-8 at 6.

[29] *Id.* at 7.

[30] *Ibid.* He also noted that Walmart has told his team that "made in the USA is a priority for them." *Id.* at 9. But this third-party statement by Walmart that is offered for its truth is textbook hearsay and not proper summary judgment evidence. *See, e.g., Porter v. Quarantillo,* 722 F.3d 94, 97 (2d Cir. 2013).

[31] Doc. #218-9 at 3; Doc. #206-12. Barnette also names Walmart as an example of "customers who will mention that they have initiatives around 'Made in the USA' that they would like to be able to advertise." Doc. #218-9 at 3. Again, a recitation by an ITW employee of any alleged statements of third parties like Walmart that are offered for their truth is inadmissible hearsay.

claim to most American consumers," and the plaintiff provided both survey evidence and customer reviews to this effect. *BenShot, LLC v. 2 Monkey Trading LLC*, 2022 WL 1275604, at *5 (E.D. Wis. 2022). Notably, the plaintiff in that case also secured the testimony of retailer representatives themselves—rather than having its own employees speculate about the preferences and statements of those retailers. *Ibid.*

Another of ITW's proffered cases also featured customer statements regarding a "Made in USA" preference. *See Newborn Bros. Co., Inc. v. Albion Eng'g Co.*, 481 F. Supp. 3d 312, 357 (D.N.J. 2020). A third court to consider a false advertising claim based on false designation of origin highlighted in its materiality discussion a plaintiff's proffer of market research evidence showing that origin was important to consumers' purchasing decisions. *See Kumar v. Salov N. Am. Corp.*, 2016 WL 3844334, at *8 (N.D. Cal. 2016) (granting class certification).

ITW has not offered this kind of evidence. By presenting only its employees' speculations and hearsay testimony concerning the impact of "Made in USA" labels, ITW has failed either to establish that it is entitled to judgment as a matter of law or to raise a genuine dispute of material fact concerning a required element of its claim.

In any event, even if the record showed that J-B Weld's "Made in USA" advertising was material to consumer purchasing decisions, ITW does not point to any evidence of actual injury. It suggests instead that injury may be presumed because J-B Weld's statement was allegedly literally false.[32]

But this is not the law in the Second Circuit. The general rule is that injury may not be presumed unless the parties are in direct competition with one another and if the allegedly false advertising implicates or compares the defendant's product to the plaintiff's product in some

---

[32] *See* Doc. #196 at 21.

way. Thus, "if Plaintiffs are in direct competition with Defendants, and if Defendants' false advertising implicated Plaintiffs in some way, then injury and proximate cause are presumed. If not, both must be affirmatively shown." *Souza*, 68 F.4th at 119. Even assuming ITW and J-B Weld to be direct competitors, ITW has failed to show that J-B Weld's "Made in USA" advertising implicated ITW or compared itself to ITW in some way.

Nor does ITW show that ITW and J-B Weld are the only two competitors in the relevant markets, such that—by zero-sum principles—it can be presumed that a false advertisement that helps Competitor #1 necessarily takes sales away from Competitor #2. *See Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 260-61 (2d Cir. 2014) ("We hold that where, as here, a plaintiff has met its burden of proving deliberate deception in the context of a two-player market, it is appropriate to utilize a presumption of injury."). Ultimately, injury cannot be presumed, and ITW's claim against J-B Weld's "Made in USA" advertising therefore must fail for lack of any affirmative showing of actual or legally presumed injury.

In short, I will grant summary judgment for J-B Weld against ITW's claim against J-B Weld's "Made in USA" advertising on the ground of ITW's failure to show a genuine issue of fact as to materiality and injury. In light of this ruling, I need not address the parties' additional arguments concerning ITW's "Made in USA" claim.

### OEM counterclaim

ITW moves for summary judgment as to J-B Weld's OEM counterclaim under the Lanham Act on the ground that it is barred by the equitable doctrine of laches. "Laches is an equitable defense, precluding the claims of a plaintiff who is guilty of unreasonable and inexcusable delay that has resulted in prejudice to the defendant." *Republic of Turkey v. Christie's Inc.*, 62 F.4th 64, 71 (2d Cir. 2023). ITW must show the following three elements in

order to prevail on this defense: (1) that J-B Weld "knew" or "should have known" of ITW's misconduct; (2) that J-B Weld "inexcusably delayed in taking action"; and (3) ITW "was prejudiced by the delay." *Ibid.*

As I have explained in a prior ruling for this case, courts determine the presumptive cutoff period for laches under the Lanham Act by looking to the analogous state law limitations period that would govern a claim for fraud. *See ITW Works Inc. v. J-B Weld Co., LLC*, 2021 WL 4310576, at *3 (D. Conn. 2021). Here, that period is three years. *Ibid.* "If a plaintiff has waited beyond the statute of limitations that would govern an analogous state law claim for fraud, then the burden shifts to the plaintiff to show why it would be inequitable for the complaint to be dismissed on grounds of laches." *Ibid.*

Here, J-B Weld filed its counterclaims in July 2020, such that the analogous state law statute of limitations would presumptively bar any Lanham Act claim based on conduct occurring before July 2017.[33] But ITW has been using OEM advertising since 2001. According to J-B Weld, however, the relevant period should be deemed to begin in 2014 when J-B Weld entered the market.[34] And it suggests that "it is not unreasonable for a new market entrant to not immediately sue the most significant competitor in the market over advertising claims used by that competitor for nearly 15 years."[35]

Yet J-B Weld cites no helpful precedent to support this argument. And J-B Weld's "new market entrant" argument still does not excuse its waiting for six years until 2020 to file its lawsuit, approximately three years beyond the three-year statute of limitations. Thus, there is no genuine issue of fact to dispute the first two elements of the laches defense: that J-B Weld knew

---

[33] Doc. #68.

[34] Doc. #221 at 33.

[35] *Ibid.*

or should have known of ITW's alleged misconduct in 2014—well outside the limitations period that would ordinarily bar its claim—and that it was inexcusably delayed in bringing a claim against ITW.

Nor is there a genuine factual dispute on the third element: whether J-B Weld's delay in bringing a claim has prejudiced ITW. To be sure, "the mere lapse of time, without a showing of prejudice, will not sustain a defense of laches." *Conn. Gen. Life Ins. Co. v. BioHealth Lab'ys, Inc.*, 573 F. Supp. 3d 671, 683 (D. Conn. 2021) (quoting *Zuckerman v. Metro. Museum of Art*, 928 F.3d 186, 193 (2d Cir. 2019)). On the other hand, "little prejudice" need be shown if a plaintiff has no excuse for delay. *See Satan Wears Suspenders, Inc. v. Jaar*, 2022 WL 2181449, at *7 (S.D.N.Y. 2022); *CSL Silicones, Inc. v. Midsun Grp. Inc.*, 301 F. Supp. 3d 328, 366 (D. Conn. 2018).

Here, ITW's evidence shows that it has marketed and continued to market its product with the OEM claim for nearly twenty years, and it insists that it would be prejudiced now by being forced to discontinue a marketing strategy it has relied on for so many years and with the risk that customers will assume—in the absence of OEM labeling claims—that the formulation of its products have changed.[36] This type of prejudice is well recognized as the basis for a laches defense. *See, e.g., Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 192 (2d Cir. 1996) ("As the district court clearly found, Campbell committed massive resources to best exploit a marketing strategy which it chose a half dozen years ago. By waiting over five years to assert its present claim, Conopco precluded the possibility that Campbell could effectively adopt an alternative marketing position. Thus, the district court properly found that Campbell had been prejudiced by the delay."); *Rexall Sundown, Inc. v. Perrigo Co.*, 651 F. Supp. 2d 9, 32–33 (E.D.N.Y. 2009)

---

[36] Doc. #194 at 25-26.

(finding prejudice from risk of consumer confusion from discontinuation of longstanding

advertising claim re affiliation to the Arthritis Foundation).

Although J-B Weld raises questions about how much prejudice ITW has sustained, there

can be no reasonable dispute that ITW has sustained at least some prejudice due to J-B Weld's

inexplicable delay. And, as noted above, a showing of even a little prejudice is enough to sustain

the laches defense in light of J-B Weld's unusually long delay in pursuing its OEM counterclaim.

Thus, J-B Weld has failed to show a genuine issue of fact that it would be inequitable to apply

laches to bar its over-ripe OEM counterclaim. Accordingly, I will grant ITW's motion for

summary judgment to dismiss J-B Weld's OEM counterclaim on the ground that it is barred by

laches.

### Epoxy counterclaim

ITW moves for summary judgment on J-B Weld's epoxy counterclaim, arguing that the

difference between chemical epoxides and non-epoxide two-part adhesives is not material to

consumer purchasing decisions. ITW principally relies on the Eleventh Circuit's decision in *J-B

Weld Co., LLC v. Gorilla Glue Co.*, 978 F.3d 778 (11th Cir. 2020). In that case, J-B Weld

brought a false advertising claim against a different competitor based on the competitor's use of

the term "epoxy" in advertising its non-epoxy MMA-based product. *See id.* at 798. The Eleventh

Circuit rejected J-B Weld's claim. It noted that "consumers likely categorize 'epoxies' as all

two-part resin-and-hardener adhesives, regardless of the chemical constitution of the resin." *Id.*

at 797. And it cited the testimony of J-B Weld's own expert "that consumers likely only care

about whether the product sticks two surfaces together effectively." *Ibid.*

As to J-B Weld's argument that there were "safety and odor" differences between epoxy

and MMA adhesives, the Eleventh Circuit ruled that "J-B Weld has not made any showing that

these differences would matter to a consumer" and that "[w]ithout evidence on the issue, it would be pure speculation to hold that, due to some difference in the function or efficacy of the product, consumers are materially deceived when they purchase an adhesive advertised as an 'epoxy' and receive an MMA-chemistry product." *Id.* at 798. Thus, the Eleventh Circuit held that—notwithstanding the chemical differences between epoxy and MMA adhesives—J-B Weld had failed to demonstrate that any chemical difference was material to customer purchasing decisions. *See ibid.*

The record here does not differ significantly from the record in *Gorilla Glue.* One difference is that J-B Weld has now offered a smattering of Amazon customer reviews in which a few customers inquire directly or indirectly about the chemical epoxy composition of ITW's product. But these alone are far too thin a reed to support a jury verdict in J-B Weld's favor on the issue of materiality. No reasonable jury could conclude on the basis of J-B Weld's sampling of Amazon reviews that ITW's epoxy claim is likely to influence consumer purchasing decisions. J-B Weld otherwise relies on the same or highly similar arguments that were persuasively rejected by the Eleventh Circuit in *Gorilla Glue.*

J-B Weld also argues that the "context" in *Gorilla Glue* was different because the product at issue there was sold in "tubes" rather than "syringes."[37] But J-B Weld does not explain why any tube/syringe difference in context would likely make any difference to consumer purchasing decisions.

J-B Weld also cites its own CEO's opinion about whether ITW's epoxy claim would affect consumer purchasing decisions.[38] But J-B Weld's CEO has not been noticed or qualified as a neutral expert on consumer purchasing decisions, and his self-interested opinion about

---

[37] Doc. #221 at 38.
[38] Doc. #226 at 27; *see also* Doc. #221 at 27 (sealed filing with content of CEO's deposition testimony).

consumer purchasing decisions exceeds the limits of permissible lay opinion testimony that must

be based on a witness's own sensory perception. *See* Fed. R. Evid. 701; *Tyson v. Dep't of Energy*

*& Env't Prot.*, 2024 WL 397205, at *7-8 (D. Conn. 2024).

In short, J-B Weld has not demonstrated that there remains a genuine issue of material

fact for trial as to whether ITW's epoxy advertising claim is likely to affect consumer purchasing

decisions. Accordingly, because there is no genuine issue of fact as to the materiality of any false

advertising by ITW concerning epoxy, I will grant ITW's motion for summary judgment on J-B

Weld's epoxy counterclaim.

### *Damages for OEM and epoxy counterclaims*

As an alternative to summary judgment on J-B Weld's counterclaims, ITW seeks

summary judgment on any attendant damages J-B Weld might seek for its OEM and epoxy

counterclaims. At oral argument, J-B Weld abandoned its argument for actual damages.[39]

Still, J-B Weld continues to seek disgorgement of ITW's profits. But "a Lanham Act

plaintiff has no entitlement to disgorgement if it cannot independently demonstrate causation and

injury, either through a presumption of injury or evidence of the same." *In re Elysium Health-*

*ChromaDex Litig.*, 2022 WL 421135, at *20 n.6 (S.D.N.Y. 2022); *see also Dependable Sales &*

*Serv., Inc. v. TrueCar, Inc.*, 394 F. Supp. 3d 368, 373 (S.D.N.Y. 2019) ("a false advertising

plaintiff must demonstrate injury either by proof of injury or a presumption of injury in order to

proceed with a disgorgement claim").

J-B Weld has failed to show a genuine issue of fact that it was injured by ITW's OEM or

epoxy advertising. It claims that ITW's use of OEM advertising caused it to lose its sealants

---

[39] *See* Doc. #262 at 66.

business at several national retailers.[40] But the evidence J-B Weld cites does not support a causal connection.[41] And J-B Weld does not even attempt to show injury resulting from the epoxy labeling. Therefore, J-B Weld is not entitled to disgorgement of ITW's profits because it has failed to show a genuine issue of fact to show that it suffered actual damages or that it is otherwise entitled to a presumption that it was injured by reason of ITW's allegedly false advertising.

Nor is J-B Weld entitled to claim nominal damages for its OEM and epoxy counterclaims. For claims of false advertising, the Lanham Act provides that a defendant "shall be liable" only to "any person who believes that he or she is or is likely to be damaged by such act." 15 U.S.C. § 1125(a)(1)(B). In turn, the remedies available for a false advertising claim under 15 U.S.C. § 1125(a) are limited to "and subject to the principles of equity … (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). By its terms, the Lanham Act does not mention or authorize an award of nominal damages for the benefit of plaintiffs who are unable to show that they have suffered some form of damages, whether actual or presumed, arising from a claim that a defendant engaged in false advertising of its own products.

Because J-B Weld has not shown actual or presumed damages for the reasons discussed above, I conclude that J-B Weld may not pursue its OEM or epoxy counterclaims solely in hopes of garnering an award of nominal damages. Indeed, if I were to conclude to the contrary, then it would effectively allow J-B Weld to maintain its claims despite the lack of any injury-in-fact that

---

[40] *See* Doc. #221 at 40 ("J-B Weld lost its sealants business at AutoZone, Advance Auto Parts, and NAPA during approximately the 2019-2021 line review time periods. In discussing that lost business, J-B Weld understood that one factor influencing those decisions was ITW's 'OEM' approval advertising.").

[41] *See* Doc. #223-22 at 3-4. J-B Weld's 30(b)(6) deponent testified that he was told by various retailer customers that J-B Weld was losing business because ITW used "OEM" labels and J-B Weld did not. This is hearsay.

is required for standing under Article III of the Constitution. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021) (allowing award of nominal damages only if plaintiff has suffered a completed injury for a violation of constitutional rights "even if he cannot or chooses not to quantify that harm in economic terms"). An award of nominal damages presupposes some form of injury, even if that injury cannot be quantified in the form of compensatory or statutory damages. Here, there is no genuine fact issue to show that J-B Weld was injured or damaged at all by ITW's OEM and epoxy advertising, so J-B Weld is not entitled to litigate these claims in order to seek nominal damages.[42]

 In short, I will grant ITW's motion for summary judgment on damages as to both the OEM and epoxy counterclaims. J-B Weld concedes it cannot prove actual damages, and in the absence of any actual or presumed injury to J-B Weld, it is not entitled to disgorgement or nominal damages.

## CONCLUSION

For the reasons set forth above, the Court GRANTS in part and DENIES in part the parties' cross-motions for summary judgment (Docs. #193, 198). The Court DISMISSES ITW's "Made in USA" claim against J-B Weld and DISMISSES J-B Weld's OEM and epoxy counterclaims against ITW.

---

[42] District court cases go both ways on the issue of whether a court may award nominal damages under provisions of the Lanham Act that do *not* involve false advertising claims. One decision allows the award of nominal damages for a Lanham Act claim involving false designation of origin. *See City of New York v. Tavern on the Green Int'l LLC*, 2021 WL 1316956, at *3 (S.D.N.Y. 2021). But it is unclear from this decision whether the plaintiff suffered an injury, and this decision does not discuss whether nominal damages may be awarded in the absence of any showing of actual or presumed injury in the first instance. By contrast, another decision rules that nominal damages are not available for a counterfeit mark violation of the Lanham Act in the absence of any actual damages or a claim for statutory damages. *See Greene v. Brown*, 104 F. Supp. 3d 12, 18 (D.D.C. 2015), *on reconsideration in part*, 174 F. Supp. 3d 295 (D.D.C. 2016). Because these decisions did not involve claims for false advertising under the Lanham Act and apparently did not involve plaintiffs who failed to show actual or presumed damages or injury, they do not furnish useful guidance with respect to the issue of whether J-B Weld may seek nominal damages in this case.

It is so ordered.

Dated at New Haven this 9th day of September 2024.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge